Filed 4/11/23  Boy v. Zimmer CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| JENS BOY,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>ZIMMER, INC. et al.,<br><br>     Defendants and Appellants. | D077123<br><br><br><br>(Super. Ct. No. 37-2016-00002761-CU-DF-CTL) |

APPEAL from orders of the Superior Court of San Diego County, Richard S. Whitney, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Iredale and Yoo, Eugene G. Iredale, Julia Yoo, and Grace Jun for Plaintiff and Appellant.

Faegre Drinker Biddle & Reath, Ellen E. Boshkoff, Amanda Semaan, and Samantha M. Rollins for Defendants and Appellants.

INTRODUCTION

On March 6, 2015, Zimmer Dental's director of human resources Matt Wilson asked vice president of Global Sales Jens Boy to meet with him at the start of the day.  Zimmer, Inc. (Zimmer) and Zimmer Dental's chief financial

officer (CFO) Jim Crines called into the meeting and terminated Boy's employment. Crines explained that the company had undertaken an internal investigation based on an anonymous whistleblower phone call to the company's compliance hotline. He determined that Boy had been too aggressive in his sales tactics, for the purpose of achieving a sales target that would ensure a bonus for the executive team. Wilson handed Boy a letter that stated that Boy had "engaged in serious misconduct by deliberately engaging in fraudulent sales activity in an effort to manipulate financial results to ensure that you and others would receive certain bonus compensation. This dishonesty and falsification of company records violated Zimmer's Code of Business Conduct and the behavior of employees policy." Wilson escorted Boy from the premises.

About five months later, Boy began working as the president of the consumer products division in North America at Carl Zeiss Vision (Zeiss), where his base salary was approximately $330,000 more than his base salary at Zimmer Dental in 2015. When Boy decided to sue Zimmer and Zimmer Dental in 2016, he informed Zeiss executives of the reasons for his termination from Zimmer.

Boy sued Crines, Nathaniel Hwang, who led the internal investigation, Zimmer, and Zimmer Dental for defamation.[1] He argued three theories of defamation liability at trial. First, he contended that Crines's and Hwang's internal statements recommending his termination on the basis that he engaged in fraudulent sales activity, dishonesty, and falsification of sales records were defamatory. Second, he argued that he was compelled to self-

---

[1] Boy alleged five other causes of action, none of which are the subject of this appeal.

publish the defamatory statements to third parties. Third, he contended that Zimmer entity employees, other than Crines and Hwang, told third parties that he had been terminated "for compliance reasons," and that was not substantially true.

Following trial, the jury returned special verdicts against all defendants and in favor of Boy. The defendants sought a judgment notwithstanding the verdict (JNOV) and, in the alternative, a new trial. The trial court denied the request for JNOV but granted the request for new trial. Boy appealed. The defendants cross-appealed.

In his appeal from the order granting a new trial on all issues, Boy contends the court order fails to comply with the requirements of Code of Civil Procedure[2] section 657 because it does not adequately identify the reasons for concluding insufficient evidence supports the jury's verdict.

In their cross-appeal, the defendants contend the court erred by failing to grant JNOV because no substantial evidence in the record supports any of Boy's theories of liability. Specifically, they contend that Crines's and Hwang's statements were substantially true and made without malice so that they were protected by the common interest privilege. They also argue Boy failed to provide any evidence to support his theory of compelled self-publication or any evidence that Zimmer organization employees acting within the scope of their employment told third parties that Boy was discharged "for compliance reasons." They separately argue there was no negligence in investigating Boy's conduct or in communicating the statements, and therefore, finding liability would improperly burden the

---

2    Further statutory references are to the Code of Civil Procedure unless otherwise specified.

3

right to free speech. Finally, they contend that surprise in the form of Boy's changing testimony regarding what he disclosed to Zeiss was prejudicial and warrants a new trial.

We conclude the new trial order complies with section 657 on two liability theories: the conditionally privileged internal statements and the compelled self-publication. We conclude the order does not comply with section 657 with respect to the third theory of liability, the employee statements to third parties that Boy was terminated for compliance reasons. On that issue, however, we conclude the court erred by failing to grant JNOV because there is no admitted evidence in the record to support it. Although our conclusions regarding the theory of liability independently warrant a new trial on the issue of damages, we note that the damages portion of the order likewise complies with section 657. Finally, we conclude the court did not err in denying JNOV on the remaining issues raised by the defendants, and because the court properly granted a new trial on the liability issues, we do not reach the defendants' request for new trial on the basis of unfair surprise or misconduct. We reverse the court's order denying JNOV on the third theory of liability. We affirm the court's new trial order in all other respects.

BACKGROUND AND PROCEDURAL FACTS

Zimmer Dental is a subsidiary of Zimmer, a publicly traded, global medical device manufacturer. In April 2014, Zimmer announced it would acquire competitor Biomet. Once combined, the new Zimmer-Biomet entity would be the second largest company in the orthopedic medical device market. The merger was scheduled for completion in 2015. For successful integration, Zimmer and Biomet had to eliminate duplicate functions, entities, and employment positions. Zimmer Dental was headquartered in

4

Carlsbad, with an office complex and production facility. Biomet was located in Palm Beach, Florida, so one of the locations would have to close.

Boy was employed by Zimmer Dental as its highest-ranking sales executive. Beginning in June 2014, Boy served on an integration committee comprised of executive leadership from Zimmer and Biomet. During the integration meetings, Boy expressed concerns about closing the Carlsbad office.

In December 2014, Boy interviewed to become the president of the merged entity Zimmer-Biomet Dental. He made a case to leave the company headquarters in Carlsbad. However, the position was offered to David Josza, Boy's counterpart at Biomet. Boy was offered a different position.

At Zimmer Dental, Boy reported to the president, Harold Flynn, and Flynn reported to Zimmer CFO Crines, who also supervised Zimmer Dental as an entity.

By the end of 2014, Crines became aware that the Carlsbad office would be closing. He did not know Boy had expressed an opinion about the location of the new headquarters. Crines had announced his retirement in October; his role regarding integration was advisory.

*Zimmer Sales Targets*

Zimmer Dental executives could achieve bonuses.[3] One component of the bonus was a sales revenue target; Zimmer Dental had to achieve 95 percent of the target for the sales component payment. The finance department set the targets and determined the formula for securing a bonus. Zimmer Dental manager of financial planning and analysis Meenal Chauhan,

---

[3] Zimmer Dental paid a base salary, and certain employees were eligible for a bonus based on how the team performed.

who reported to Bradley Hinkle, Director of Finance, regularly updated Boy on the sales numbers and where the team stood with respect to the sales target. Boy and his team were focused on trying to sell enough to earn the bonus. Boy testified that achieving the target was always close, and there was always sales pressure at the end of the year.

*Automatic Shipment (Autoship) Program*

Zimmer Dental had an "autoship" program that gave price discounts in exchange for U.S. customers' agreements to make automatic purchases at regular intervals throughout the year. The standard practice was to charge the customer credit cards for products when they shipped. The shipping schedule could be modified with prior notice to the customer.

*Anonymous Whistleblower Complaint*

Zimmer had a compliance hotline for anonymous reporting of compliance violations. Zimmer considered "compliance" to include Zimmer's policies and procedures in addition to compliance with anti-fraud and anti-kickback statutes.

On January 7, 2015, an anonymous caller reported "falsification of accounting records or documents," naming Flynn, Boy, and Marcy Lopez-Greer, a customer service representative. The caller said that Boy instructed the release of January autoship orders in December to meet an executive bonus quota, and the caller believed Boy did so at Flynn's direction. The complaint was reported to the chair of the audit committee, which then requested a response from the finance department.

When the anonymous complaint was reported, the finance division was in the midst of preparing financial statements for the Securities and Exchange Commission (SEC). Crines was scheduled to meet with the audit committee on February 19, 2015, and the company's deadline for filing its 10-

K report[4] with the SEC was February 23, 2015.[5] It was of great concern to Crines to understand the scope of the irregularities the anonymous caller alleged, in part to understand whether independent accountants from Price Waterhouse Cooper (PWC) would be able to complete their audit in time for a February 19 audit committee meeting.

Crines tasked Hwang, Zimmer Vice President of Compliance and Chief Compliance Officer, to investigate. Crines asked Hinkle to assist Hwang, as well as to investigate "whether or not the [autoship] transactions in question had been properly accounted for." The company had to close any open investigation with respect to the scope of any sales irregularities before filing the 10-K. Hwang was asked to provide his findings before the 10-K filing deadline.

Hwang's investigation focused on compliance issues, including whether internal conduct rules and workplace policies were violated. Other investigations focused on how the autoships might affect Zimmer's financial statements.

*Documentary Evidence*

Hwang compiled a database and reviewed thousands of emails, including every email about autoships and sales to a Japanese distributor, Hakuho. He reviewed Zimmer Dental autoship contracts, sales records, company policies, information gathered by outside auditors, financial records, and product return logs. He consulted with Zimmer's finance director and reviewed the finance department's accounting opinion.

---

[4]    A 10-K report explains the corporation's financial condition, business opportunities, and risks for investors.

[5]    The SEC deadline was around March 1, 2015.

On December 17, 2014, Chauhan, who also ensured transactions were correctly recorded in the proper month, quarter, and year, emailed Flynn and copied Hinkle to inform them that they would need $1 million in additional sales to earn a 70 percent payout. Flynn forwarded the information to Boy, who replied, "Understood–working on it."

On December 23, 2014, Boy emailed Director of US Sales Rick Hayse and Director for the West of the US Craig Fujii that they had sold $2.5 million the previous year, from December 23 through 31, and they needed to sell more than that in 2014. Boy wrote: "[F]inal stretch . . . 'anything goes' we need the sales." Hayse replied that he was still pushing sales, but not much was shipping because of back orders.

On Friday, December 26, Boy emailed Daniel Guthrie, the general manager for Zimmer Dental China and the general manager of biologics, that they needed to achieve $242.6 million in sales to get "any bonus payout for our sales performance." Based on their most recent projection, they were about $200,000 short, "which results in zero payout for the sales component of our bonus," meaning they would receive "a 50 [percent] bonus payout vs. a 70 [percent] bonus payout if [they] achieved the $242.6 [million in sales]." Boy wrote: "Whatever you can pull into December . . . pull it in."

Boy testified at trial that he believed they crossed the revenue target threshold the morning of December 30, and based on what he learned from Chauhan around 11:00 a.m., he was not worried about meeting the sales target. He could not recall if Chauhan told him at that time that the final calculation of the exchange rate, which would determine their sales revenues internationally, would not be confirmed until after the end of the year. He was still focused on selling, and he wanted to get to 100 percent or 110 percent; he "didn't stop . . . worrying about sales, that's what [he does.]"

Later that day, after a sale was processed, Boy wrote to an associate sales director in Latin America, "Very good–thank you–we still need every single $ we can get. [¶] Still fighting hard including tomorrow for our bonus . . . it is very close . . . need strong US sales today and tomorrow to have a chance. . . ." At trial, Boy confirmed that he believed whether they would achieve the bonus was close and that they needed every single dollar to get that part of the bonus.

On December 31, Boy asked Chauhan for a projection of whether they would meet their sales goal because it was still in doubt.

At around 8:00 a.m. on December 31, Boy directed the release of all autoships for the second half of January. He was concerned, based on the build-up of international orders being released to distributors, that there could be an inventory issue regarding RTI-manufactured materials for the U.S. autoship customers.[6] Boy was not aware there were typically two or three months of inventory on hand for the products that were autoshipped, and he did not ask what the supply looked like before he released the autoships early. He did not know whether he could place a hold on the volume of the product needed for the autoships.

In an email shortly thereafter, also on December 31, Boy directed Marilee Metzger, Director of Customer Service, and Lopez-Greer to release all autoships for January for a different reason— "to protect our most important Regen customers and to ensure these customers have enough product in January." Boy wrote that there were supply issues at the beginning of the previous year, that he believed they would see several large Regen orders in early January from representatives who did not make their

---

[6]     RTI Surgical was a supplier to Zimmer Dental.

fourth quarter sales numbers, and that he wanted to "avoid a repeat of [those] problems" in 2015.[7]

Lopez-Greer reported to Boy that she received "several calls from upset reps" who inquired about the release of automatic shipments that were not scheduled for December. Those representatives wanted the sales numbers to count in the new year. Lopez-Greer told Boy that she did not notify them that the autoships were intentionally sent early; instead, she indicated there may have been a system glitch and she would look into it.[8] Boy directed her to release the remaining autoships, and to let the representatives know that Zimmer Dental was expecting large domestic and distributor orders in the first two weeks of January. The company wanted to protect their most valuable accounts and ensure product availability to them.

At trial, Boy acknowledged the early autoships impacted the sales representatives in terms of their January quotas, and Zimmer Dental adjusted those quotas downward as a result. The remaining autoship orders were sent December 31, 2014 and amounted to approximately $96,000 in sales.

On January 1, 2015, Boy commented in an email to Meyers, "[W]e covered the international shortfall by selling a lot more in the U.S. [¶] Great job by everyone. [¶] Based on our previous calculation this should [g]et us into the bonus money."

---

[7] At trial Daryle Meyers, the supply chain management director, testified that although there had been supply issues at the start of 2013, there was no reason to expect the sales representatives' behavior to impact the supply of this particular product.

[8] There was no indication there was a system glitch.

On January 8, 2015, Hinkle emailed Zimmer employee Derek Davis that Zimmer Dental was at 95.8 percent on sales for bonus, or about $2 million over the 95 percent cutoff.

*Autoship Investigation*

In December 2014, Flynn authorized an early shipment of materials scheduled to autoship in the first two weeks of January. Flynn wrote in a January 9 email that there was a "bolus of international distributor orders building that had not yet shipped," and he was concerned that the backorder would impact some of their larger customers. Further, because Zimmer Dental would be closed for the first few days of the year, Flynn wanted to protect the customers by shipping their orders early. He authorized the shipment because he was concerned about depleting resources from 2014 orders being filled at the start of 2015.

On December 31, Boy directed the early release of the last two weeks of January autoship orders. Neither Flynn nor Boy notified the customers in advance.

Flynn was not aware of the requirement to provide notice of contract modifications, like early shipping, at the time. Recognizing they had not notified customers in advance, he directed customer service to call each of the recipients to inform them of the early shipments and confirm that it was acceptable. Flynn later told Hwang it was his idea to pre-ship the first two weeks of January autoship orders, but while Flynn was out of the office Boy made the decision to ship the remainder.

Meyers testified that he did not expect any large domestic or distributor order that would have impacted the RTI biologics supply, and neither Boy nor anyone else talked to him near the end of 2014 about the potential for supply problems.

*Hakuho Transactions*

PWC recommended sending correspondence to several international distributors to evaluate whether there were any unusual terms or conditions offered on year-end sales transactions with Zimmer Dental. During the 15 years that Crines served in a role with responsibility for closing out financial statements, this was the only time an outside auditor directed him to send such letters. Zimmer sent letters to six international distributors, including Hakuho, asking them to confirm that there had been no exceptions to the sales terms of Zimmer Dental purchases and to identify any side deals or special terms. The only response came from Hakuho. Hwang was asked to investigate Hakuho's response.

In 2014, Hakuho purchased approximately $13 million in products from Zimmer Dental. Though there was no written contract between Zimmer Dental and Hakuho as of December 2014, Zimmer Dental made or acquired implant products in Carlsbad for the exclusive use of Hakuho. Zimmer also acquired biologic products, also call "P products," manufactured by Integra LifeSciences (ILS), to sell to Hakuho. These products had a "shelf life" for their use, and Hakuho preferred Zimmer to provide the biologic products immediately out of production for the longest shelf life. Zimmer had difficulty meeting this demand because ILS did not consistently supply the product.

Boy testified that Zimmer only guaranteed to Hakuho biologic product with a shelf life of one year, and Hakuho was unhappy and frustrated with Zimmer Dental's inability to deliver biologic (P products) with the longer shelf life that Hakuho preferred. He had shelf-life discussions with Hakuho for four or five years, and Hakuho usually accepted what Zimmer Dental offered because Zimmer Dental could not fill Hakuho's requirement. Boy

12

insisted he guaranteed only a one-year shelf life; Boy was not aware of a flag in the ordering system that prevented shipment of short shelf-life product to Hakuho.

Meyers testified that the standard requirement was one-year shelf life remaining on international shipments, but the agreement with Hakuho was to set 20 months of shelf life for the biologic products and 36 months of shelf life on Colla products. Zimmer Dental shipped product to Hakuho that did not meet those shelf-life requirements only with customer approval. He disagreed with Boy's statement that the shelf-life requirement was only one year. No one told him that Hakuho had agreed to P products with a one-year shelf life.

*Discounted Sales Offers to Hakuho*

Hakuho agreed to complete $11.1 million in transactions with Zimmer Dental in 2014. On November 18, 2014, Boy offered a 10 percent discount in exchange for Hakuho buying $1 million more in products in 2014; plus, Zimmer would accept a reduction in 2015 transactions, requiring $9.5 million in purchases. Then Boy offered a 15 percent discount in exchange for $2 million more in orders in 2014, with a reduction in 2015 transactions, requiring $8.5 million in purchases. Hakuho agreed to purchase the additional $2 million in products in 2014 in exchange for the future discount.

Crines viewed this as a discount in exchange for bringing 2015 purchase commitments into 2014. It was the first time Zimmer Dental offered such discounts and incentives. Crines believed Boy was sacrificing the business going forward; once prices were lowered, it would be difficult to raise them.

On November 28, 2014, Boy also offered Hakuho a discount on some implant products, reducing the cost from $145 to $115, in exchange for placing an additional order for 2,000 implants. Hakuho declined.

On November 29, 2014, Boy offered the price discount plus a kit promotion that was scheduled to go into effect in 2015 in exchange for placing an additional order for 1,000 implants. Hakuho declined.

On December 30, 2014, Boy emailed Hakuho, explaining that Zimmer was "still trying to generate some final year-end sales." He offered a one-day special, a discounted price on the 105P biologics product. Hakuho declined.

*"Small Favor" Hakuho Transaction*

On December 22, 2014, Meyers informed Boy that Zimmer Dental did not have the quantities of implant sizes in stock that Hakuho previously ordered. Meyers noted he had other implant sizes in stock that could fulfill the order quotas. He suggested sending a different number of each size of implants than requested, based on what was in stock. The overall price remained the same.

On December 23, Boy emailed Hakuho and asked for a "small favor," acceptance of implants that were different sizes than the ones Hakuho had ordered. Boy offered to replace the implants and pay shipping if Hakuho decided in January to change back to the original sizes it wanted. Boy explained Zimmer Dental could not manufacture some of the ordered implants to ship in 2014, and he was asking "so that [Zimmer] can recognize the sale this year." Hakuho agreed. At trial, Boy explained he wanted to make sure Hakuho could fulfill its purchase commitment and Zimmer Dental could fulfill its commitment. Boy did not alert the finance department to this sale.

14

Zimmer Dental's general distributor return policy did not allow product return. However, Boy had authority to accept returns and to refund the price, as well as to authorize exchanges, which meant changing out the product without any change in the price. Boy viewed his email as an offer to exchange any implants, not an offer for Hakuho to return them, because Zimmer Dental would keep the money Hakuho paid, at the cost of a couple hundred dollars for shipping.

Hakuho accepted Zimmer Dental's offer.

Crines found this offer to be problematic and fraudulent because its intent was to get revenue recognized in 2014 instead of 2015, and because it committed the company to make additional implants in 2015 in order to execute the exchange and replace the inventory previously shipped.

*Nonconforming Shelf-Life Order*

In late November 2014, Hakuho sent a purchase order for 2,000 biologic pieces, and it authorized 600 of them to have an expiration date of May 31, 2016. On Friday, December 26, Meyers explained to Boy that Zimmer Dental had inventory to apply to Hakuho's open orders, but the products had a shorter shelf life than Hakuho requested. On Monday, December 29, Boy directed Meyers to use the available inventory to complete open orders, even though the shelf life of some items was shorter that Hakuho wanted, writing, "I'll address any potential concerns by Hakuho separately."

Typically, Zimmer Dental obtained approval before shipping "short shelf life" products. Boy knew the products did not meet Hakuho's shelf-life requirements, but he believed Hakuho would need the product, and he ordered the release without notifying Hakuho. At trial, Boy confirmed that this product was worth about $102,000, and by sending these orders, Boy was able to reduce an anticipated $200,000 sales target shortfall.

15

On January 6, 2015, Hakuho rejected the shipment because the shelf life was too short. Hakuho's email stated that it needed more than 32 months of shelf life for two of the products and 20 months or longer for a third product.

Boy encouraged Hakuho to retain the shipment; he was concerned Zimmer Dental would not receive additional supply for several months, and he did not want Hakuho to run out. Ultimately, Boy accepted the return. It reduced their sales in 2014 by $102,000. Boy documented the transaction and alerted Flynn.

Hakuho identified this transaction as an exception to the parties' standard sales terms and the first time a transaction like this had been completed. Zimmer Dental's policy governing returns and exchanges stated that the distributor would not return any portion of its inventory without the company's consent.

The "small favor" and "non-conforming shelf life" orders were "booked as a sale" when the product left the dock in 2014.

*Interviews*

Hwang interviewed 11 Zimmer employees using outlines created for each one. These interviews all occurred February 18, 2015, in time for the audit committee meeting the following day. Hwang did not record or

16

summarize any witness statements.  He took notes and summarized findings from their interviews.9

Metzger testified that she found Hwang to be aggressive during his interview, leaning in, and speaking curtly with a rude tone.  She felt intimidated by his questioning, but she told Hwang the truth.  Hwang asked if Boy had asked her to do anything illegal or improper.  She said no.  She also testified that every quarter, there was a push to increase sales to achieve the bonus.  She said Hwang seemed angry when she denied Boy acted improperly, and Hwang interrupted her.

Hwang denied that he was rude or dismissive.  He testified that Metzger's demeanor changed when he asked about Boy; she was guarded and protective.

Hwang asked Flynn about the "small favor" transaction with Hakuho.  Hwang expressed concern that the email's optics suggested Boy was offering a right of return, not a right of exchange.  Although Flynn perceived the offer to be a right of exchange, he testified the offer could have been worded more clearly, and he could understand the potential negative optics.  Flynn told Hwang that he gave Boy "a long leash," and that Boy just checked in with him on transactions, but he was not aware of the transactions at the time.

---

9      The court denied Boy's motion in limine to exclude evidence or reference to the defendants' investigation materials, information, and results. In its written order, the court explained that the defendants provided Boy's counsel with the investigation report, documents upon which Hwang relied, and the list of all witnesses with which Hwang spoke, but they did not provide Hwang's notes.  The court reviewed Hwang's notes in camera and found that it was not possible to decipher what notes pertained entirely to the facts and which ones pertained purely to mental impressions or thoughts. Defense counsel agreed not to use the notes to refresh Hwang's memory or otherwise attempt to use the notes at trial.

17

Meyers testified that he told Hwang it was not his understanding of revenue recognition that the company could ship product with the expectation that it would be later returned and capture it as revenue. However, he never received any training by the company in accounting principles or revenue recognition principles. He did not find Hwang to be rude, and he felt Hwang was listening to his answers. He did not get the impression that Hwang was looking for particular answers to his questions.

The last interview was with Boy, who was in Dubai for business meetings. There was no scheduled interview. Hwang reached out to Boy via text messages and voicemail, and Boy called Hwang. Boy testified that Hwang accused him of changing terms for distributors at the year's end and referenced the Hakuho biologics transaction. Hwang read at least one email regarding Hakuho's transactions to Boy. Boy told Hwang that Hakuho was a unique customer; that only he knew how to handle Hakuho, and no one else could understand; and that he knew Hakuho would re-order the product that it had returned because it needed that product.

Boy contacted Hwang again at the beginning of February to inform Hwang that Hakuho reordered the same biologics product it had returned. Hwang did not respond or communicate directly with Boy after the interview. On February 3 and 13, 2015, Hakuho ordered biologic products. Contained in the order were several products matching those it rejected in January. Not all the returned products were re-ordered.

*Reports to Zimmer Executives*

Chad Phipps, Zimmer General Counsel, asked Hwang to report his initial findings. Hwang briefed Crines, PWC, and other Zimmer officials on February 19, 2015, reporting that Boy had directed three transactions (two with Hakuho and the early autoships) for the purpose of hitting year-end

18

revenue targets to achieve bonuses. In that call, he did not state that Boy had engaged in fraud.

PWC reported to the audit committee that the management concluded that the transactions in question "had been recorded in accordance with Zimmer accounting policies and the total amount of such transactions was insignificant (approximately $160 thousand)." Crines certified the financial statements containing the revenue from the autoships and the two Hakuho transactions as accurate, including them in the official financial statements. Zimmer filed its 10-K report February 23.

*Termination Decision*

At some point between February 19 and March 3, 2015, Hwang told Crines that he saw "clear and significant" documentary evidence that the sales transactions were being entered for the sole purpose of achieving the $242.6 million revenue target so that the dental team could earn the sales component of their bonus. Because he concluded the unusual transactions occurred for the purpose of pulling revenue from 2015 into 2014 so that they could hit the revenue component of the bonus, he believed they were illegitimate. Although Hwang testified that he had no reason to believe Flynn lied, Hwang did not find credible Flynn's explanation that the early autoships were sent due to inventory issues.

Hwang sent an email on March 3, 2015, to Phipps, Crines, and senior vice president of human resources Bill Fisher explaining a compliance hotline report had triggered an investigation into whether leaders had engaged in inappropriate and fraudulent sales activities to ensure a year-end bonus payout for themselves and other employees. The email explained that the sales amounts involved were "immaterial from a financial reporting perspective," but Hwang nonetheless concluded the actions were "considered

19

dishonesty and fraud. These actions resulted in falsification of company records, which is serious misconduct under Zimmer's Code of Business Conduct and behavior or employees policy."

Crines agreed that Boy's actions were dishonest and fraudulent. He was persuaded by the information from Hakuho, the emails, and Hwang's reported information, that the purpose behind the various year-end transactions was to get the executive bonus payout on the sales component of the bonus. He believed the appropriate corrective action was to terminate Boy's employment.

Hwang, jointly with Crines, recommended Boy's "immediate separation from employment." Crines authorized Hwang to send the email recommendation to Phipps and Fisher.

*Termination of Employment*

The usual procedure was to hold termination meetings at the end of the business day. On March 6, 2015, Crines terminated Boy's employment over the phone shortly after 9:00 a.m. Wilson scheduled the meeting and was present during the call. Crines told Boy that he had engaged in fraud and falsification of records, and that Boy had been too aggressive pursuing sales targets with a Japanese distributor. Wilson hand-delivered a termination letter at the meeting. The letter stated: "We recently concluded through investigation that you engaged in serious misconduct by deliberately engaging in fraudulent sales activity in an effort to manipulate financial results to ensure that you and others would receive certain bonus compensation. This dishonesty and falsification of company records violated Zimmer's Code of Business Conduct and the behavior of employees policy. As a result, your employment is terminated effective as of the date set forth above." Wilson escorted Boy from the building.

20

The termination occurred before stocks and options vested that year for Zimmer employees.[10] Although Boy was initially told his stocks and options would vest, Hwang informed Boy that he would not receive them because of the reason for his termination. A March 6, 2015 letter to Boy from Crines on Zimmer letterhead stated Boy would receive a pro-rata portion of the restricted stock units or performance-based restricted stock unit awards that were granted before 2012 that was already vested. It stated that restricted stock units granted in 2012 or later were not eligible for pro-rata vesting.

Crines knew Boy's discharge would result in him losing the vested stock, but he did not time Boy's termination to deprive Boy of the stock and option benefits.

*Employer Reference Policies*

Boy introduced testimony from corporate recruiter William Brewer, who explained that he would not present an applicant who had been discharged for fraud or falsification of records, even if the applicant claimed to be innocent. Moreover, he would not hire someone about whom such an allegation was discovered via a back-channel search.

Crines testified that when a third-party reference was sought, it was Zimmer and Zimmer Dental policy to confirm the dates of employment and the last position held only. Flynn was aware the policy was to not share information about the reasons for termination with prospective employers. He was not aware of that policy being violated.

---

[10] An option is the right to buy a share of stock at a particular price, called the "strike price," which can be lower than the value of the stock. The stocks were restricted stock units that were not immediately transferrable or sellable but that could be sold after they were fully vested. The vesting occurred in March.

21

*Communications About the Termination*

Crines never communicated to anyone outside the group of decisionmakers his conclusion that Boy engaged in fraudulent sales activities, falsification of company records, or dishonesty. He had no knowledge that anyone else had, either.

Aside from the people he communicated with regarding the termination decision, Hwang never personally communicated any information to the effect that Boy engaged in fraud or fraudulent sales activity or falsification of company records or that Boy was dishonest.

Flynn concluded Boy's discharge was related to the sales activities and the company's judgment of their propriety, but he did not recall Crines talking with him about Boy's termination, and he was not told why Boy was discharged from employment.

On March 17, 2015, Hwang wrote a memorandum to "HR File" with the subject "Jens Boy Investigation Summary." He wrote that Boy "engaged in unethical and inappropriate behavior," participated in "fraudulent activities," and he stated that Boy "engaged in unethical and fraudulent sales activity, violating [Generally Accepted Accounting Principles,] GAAP[,] and Zimmer's Code of Business Conduct, in an effort to manipulate financial results for Zimmer Dental to ensure he and Zimmer Dental would receive certain bonus compensation." At trial, he testified that he understood "fraud" to mean "[s]ome type of dishonest, deceitful act for personal gain," and that was the definition he had in mind when he drafted the memorandum; he "was not accusing Mr. Boy of legal, criminal fraud. [¶] . . . [¶] The act was a dishonest act for personal gain."

The same day, Hwang also generated a compliance report to internally track resolution of compliance hotline complaint. That report stated that

"[b]etween December 26, 2014 through December 31, 2014, Jens Boy, VP of Sales for Zimmer Dental, deliberately engaged in unethical and fraudulent sales activity, in violation of U.S. Generally Accepted Accounting Principles and the Zimmer Code of Business Conduct, in an effort to manipulate financial results to ensure that he and Zimmer Dental would receive certain bonus compensation."

*Conferences and Rumors*

On March 8, 2015, a Zimmer Dental industry event occurred at New York University School of Dentistry. Guthrie, who had reported to Boy, testified that "everyone [was] talking about how [Boy] was terminated from . . . the business, the manner in which it happened."

Jeremy Curtis, the vice president of marketing, commented to Guthrie that he thought Boy's termination from the company was a compliance issue. Guthrie testified that when someone is walked out of the building, it is usually a legal or compliance issue, and Curtis told him Boy had been walked out of the building. Boy also testified that Guthrie told him he received the same information from other Zimmer employees.[11]

Boy testified that Guthrie said that Meyers told him that Boy was fired for the Hakuho transaction. Meyers testified that no one ever told him the reason for Boy's termination.

---

[11] When plaintiff's counsel initially asked Boy to testify "specifically what Dan [Guthrie] told you," defense counsel objected to the question as eliciting hearsay. Plaintiff's counsel said he was offering the testimony as evidence of Boy's state of mind, and the court overruled the objection. Defense counsel did not object to the series of questions that followed on the basis that they elicited hearsay, though each one asked what Boy heard from Guthrie. Eventually, plaintiff's counsel asked Boy the effect of these statements on his state of mind.

23

Several months later, Guthrie spoke with the new president of Zimmer-Biomet, Josza. Josza said that he had a conversation with Boy about transitioning to a global sales commercial (CCO-type) position at the merged company, and Josza "was surprised, given the compliance issue, that [Boy] was suddenly terminated from the company." Guthrie clarified that no one disclosed any specific reason for Boy's termination. He also admitted that he did not have any basis to understand that Josza held direct knowledge as to why Boy was terminated, and he did not ask.

Guthrie did not tell Boy that he heard Boy was fired for engaging in serious misconduct by deliberately engaging in fraudulent sales activity in an effort to manipulate financial results. Guthrie communicated gossip he heard.

Terri Oto, an employee of RTI, a Zimmer Dental supplier, talked to Curtis and two other Zimmer Dental employees at a dinner during a London trade show in June 2015.

In her deposition, Oto testified that Curtis told her Boy had increased the December revenue and pumped up the sales. She did not recall him mentioning that Boy took that action to ensure a bonus or using the word "compliance" in connection with Boy's departure. She also reported that someone named Michael Racioppi had used the word "compliance" in connection with Boy's departure.

Boy testified that Oto told him that at least a dozen Zimmer Dental employees at the NYU conference called her to discuss his termination.

*Boy's Reaction and New Employment*

Boy described the period following his discharge as "the darkest period of [his] life. [He] didn't go out. . . . [He] stayed in bed very long. . . . [He] watched TV. [He] was just distraught, and [he] was simply not [him]self."[12]

Five months after his discharge from Zimmer Dental, Boy began a job at Zeiss as the president of the consumer products division in North America. When he was interviewed, Zeiss representatives mentioned the Zimmer-Biomet merger and asked the circumstances of Boy leaving Zimmer. Boy joked that he was not going to move to Florida.

At Zeiss, Boy hired people with whom he previously worked at Zimmer Dental. Where Boy had hosted holiday parties and barbecues with Zimmer Dental sales teams and distributors, he opted not to socialize with Zeiss colleagues because he feared the fraud accusation would come up. Boy's wife testified that he seemed depressed even after he obtained new employment.

In discovery responses and his deposition, Boy stated that he told his boss at Zeiss and the Zeiss vice president of human resources that he was engaging in legal proceedings against Zimmer, that "there were business transactions that were misinterpreted." They did not ask for specifics. At trial, he testified that five and a half months after he began his employment at Zeiss, Boy informed the CEO of the consumer products division that he

---

[12] Defense counsel objected to the line of questioning, arguing that the damages that result from being fired are not recoverable because it was not a wrongful termination case, and the broad, open-ended questions about Boy's feelings were eliciting information about how he felt after he was fired, not just how the alleged defamatory statements made him feel. Boy's attorney argued that the defamation caused the termination, that the information was admissible to explain the effect on the listener, and ultimately, to show why Boy felt compelled to self-publish the statements. The court agreed to give Boy's attorney some latitude on the issue of damages.

had been terminated from Zimmer Dental for fraud and falsification of records because him being escorted from the premises was public and because of statements Guthrie and Oto made to him. He felt he needed to do so before he filed this lawsuit. He separately informed the vice president of Zeiss HR. He retained his job.

Boy also disclosed the circumstances of leaving Zimmer to a job recruiter. After disclosing the information, the recruiter did not have further contact with him.

### Boy's Income

Boy's 2015 base salary at Zimmer was $308,616, with a bonus of $63,000 and accrued stock and options worth $410,000, for a total anticipated compensation of $781,616. The stock options vested over time. In 2015, Boy earned $340,000. In an email to an executive search firm, Boy wrote that his ideal next role would be as president of a division, and he told the recruiter that his total annual compensation in 2013 and 2014 was $650,000 ($350,000 base, $100,000 bonus, and $200,000 in stock and options).

In 2016, Boy earned between $647,000 and $679,000 at Zeiss, where the compensation does not include stock or options. In 2017, Boy earned in base salary and bonuses $745,000 at Zeiss, and in 2018, he earned $725,000.

### Jury Instructions

The court instructed the jury with CACI No. 1705, which details the elements of defamation per quod. The court further instructed jurors that Boy being escorted from the premises was not a statement and to disregard testimony that it constituted a statement.

Jurors received a special instruction that defined the civil claim of fraud and supplied dictionary definitions of the word.

*Special Verdicts*

The jury returned four special verdict forms and a damages questionnaire. On the forms naming Crines and Hwang as individual defendants, the jury found Crines and Hwang communicated to people within the Zimmer organization, other than Boy, that Boy "engaged in fraudulent sales activity, dishonesty, and falsification of company records," and that they "act[ed] with hatred or ill will" toward Boy, showing a "willingness to vex, annoy, or injure" Boy or that they had "no reasonable grounds to believe the truth of [their] statements." It further found that persons to whom the statements were made reasonably understood that they were about Boy, that the statements were not substantially true, and that Crines and Hwang failed to use reasonable care to determine the truth or falsity of the statements. The jury also found that the statements tended to injure Boy in his profession or occupation, that Boy suffered harm to his person or occupation, and that the statements were a substantial factor in causing that harm.

The jury separately found on the special verdicts against Crines and Hwang that Boy was "under strong pressure to communicate Defendant[s'] . . . statements that [Boy] engaged in fraudulent sales activity, dishonesty, and falsification of company records to other person(s)," and that Crines and Hwang should have known Boy would be under a strong pressure to self-publish the statements.

On the special verdict forms naming Zimmer, Inc. and Zimmer Dental, the jury found that Boy communicated the companies' statements that he had "engaged in fraudulent sales activity, dishonesty, and falsification of company records to another person," and that Boy was "under strong pressure" to communicate those statements to other persons. The jury also

27

found that Zimmer and Zimmer Dental should have known that Boy would be under strong pressure to communicate those statements to another person. Next, it found that an employee of Zimmer or Zimmer Dental, other than Crines or Hwang, "while acting in the scope of their employment," "state[d] to persons outside the Zimmer organization that [Boy] was terminated for compliance reasons," that the statement was not substantially true, that the person who made the statement failed to use reasonable care to determine its truth or falsity, that it tended to injury Boy in his profession or occupation, and that Boy suffered harm to his profession or occupation.

The jury awarded past economic loss, including harm to Boy's trade, profession, or occupation and expenses Boy paid as a result of the defamatory statement at $559,000. It awarded $500,000 for future economic loss. It awarded $1.5 million for past noneconomic loss including shame, mortification, or hurt feelings and harm to Boy's reputation. And it awarded an additional $1 million for future noneconomic loss.

*Motion for Judgment Notwithstanding the Verdict and New Trial*

The defendants moved for JNOV and for a new trial. In their memorandum supporting their motion, the defendants argued that there was insufficient evidence to find liability, that the jury's economic and noneconomic awards were both unsupported by evidence and excessive, and that attorney misconduct and irregularities in the proceedings justified a new trial.

Boy argued that because the defendants consented to the damages questionnaire and waived polling of the jury, they waived any claim of error regarding damages even if there was insufficient evidence to support one of the theories of liability, and he challenged the claim that the damages were

28

unsupported by the evidence and disputed that there was misconduct or irregularities.

Following briefing and a hearing, the court denied the defendants' request for JNOV and granted the request for a new trial. In the written order, the court outlined Boy's allegations against the defendants and arguments in favor of the verdict, along with the defendants' responses. The court recognized that the basis of the motion for a new trial was that the defendants had not acted negligently in reaching their conclusions, that there was no compulsion to self-publish the statements, that there was no proof of malice or damages, and that the award was excessive. The court explained that Boy's argument was based on a claim that the defendants were motivated financially to terminate his employment, and that Boy argued that he did not violate company policy or engage in any fraudulent activity.

The court twice noted that this was not a wrongful termination case; it also concluded that there was "thin" evidence to support the theories of liability, and that there was "a complete absence of evidence" to support the self-publication theory of liability. It found Boy's argument that the defendants should have foreseen being sued following the termination to be "speculative" and to lack "any supportive witness testimony" on the issue. It also stated that it "did not hear any supportive witness testimony" that demonstrated fraudulent conduct by the defendants. It further specified that there was "little to no evidence to support the damages award," and that there was a "complete absence of direct or indirect evidence . . . to support the size of the damages award," noting, too, that "the evidence displayed that plaintiff landed a better compensation position with a similar company to defendant." It identified "excessive damages" as the primary reason for granting a new trial, explaining it was "improper for a jury to allow

29

speculative or unfounded damages," given the "absence of supporting evidence to justify the verdict." It awarded a new trial on all issues of liability and damages.

Boy appealed, and the defendants cross-appealed.

DISCUSSION

I.

Standards of Review

A. Procedural Requirements for a New Trial Order, Section 657

The procedural requirements for making and granting a motion for new trial "are mandatory and must be strictly followed." (*Mercer v. Perez* (1968) 68 Cal.2d 104, 118 (*Mercer*).) An order granting a new trial on the ground of insufficiency of the evidence may be affirmed only for a reason given in the order. (*Id.* at pp. 114-115, 120 [appellate review is limited to reasons specified in the order].) " '[W]here the ground is insufficiency of the evidence, the purposes of the statute frequently can be satisfied only if the reviewing court and the parties to the action are given more than a statement which declares that they have failed to prove the ultimate fact which they were required to establish.' " (*Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 366 (*Scala*).) This requirement exists "to promote judicial deliberation before judicial action, and thereby 'discourage hasty or ill-considered orders for new trial,' " as well as "to make the right to appeal from the order more meaningful." (*Mercer*, at p. 113.)

A court is not required to cite the page and line from the record, discuss the testimony of any particular witness, or evaluate the weight to be given or inferences to be drawn from each item of evidence. (*Scala, supra*, 3 Cal.3d at p. 370.) There is no "hard and fast rule" regarding the content; it varies based on the facts and circumstances of the case. (*Mercer, supra*, 68 Cal.2d at

30

p. 115.)  "[A]n order granting a new trial will not be disturbed if it adequately refers to evidence in the record to support the action taken." (*Romero v. Riggs* (1994) 24 Cal.App.4th 117, 122 (*Romero*).)  However, the failure to specify reasons for granting a new trial on the ground of insufficiency of the evidence leads to "a conclusive presumption excluding that ground from appellate review." (*Mercer*, at p. 120.)

## B.  Standard of Review for Order Granting New Trial

A trial court has broad power in determining whether to grant a new trial; "orders granting motions for new trial are infrequently reversed." (*Mercer*, *supra*, 68 Cal.2d at pp. 112-113.)  "So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside.  [Citations.]"  (*Jimenez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387.)  The court has the authority to "disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact; on appeal, all presumptions are in favor of the order as against the verdict, and the reviewing court will not disturb the ruling unless a manifest and unmistakable abuse of discretion is made to appear.  [Citations.]"  (*Mercer*, at pp. 112-113.)  An order granting a new trial on the ground of insufficiency of the evidence "shall be reversed as to such ground only if there is no substantial basis in the record for any of [the specified] reasons."  (§ 657; *Romero*, *supra*, 24 Cal.App.4th at p. 124.)

## C.  Standard of Review for Denying JNOV

On appeal from the denial of a JNOV motion, we review the record de novo and make an independent determination as to whether there is substantial evidence to support the jury's findings. (*Pacific Corporate Group Holdings, LLC v. Keck* (2014) 232 Cal.App.4th 294, 309; *Begnal v. Canfield & Associates, Inc.* (2000) 78 Cal.App.4th 66, 72 (*Begnal*) [appellate review

31

limited to determining existence of substantial evidence to support verdict];
*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.) "As in the trial court, the standard of review is whether any substantial evidence– contradicted or uncontradicted–supports the jury's conclusion." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 (*Sweatman*).) We accept as true the evidence supporting the verdict; we disregard conflicting evidence, and we indulge every legitimate inference that supports the verdict. (*Begnal*, at p. 72.) "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.]" (*Sweatman*, at p. 68.) "Except where there is no room for a reasonable difference of opinion, the reasonableness of an act or omission is a question of fact, that is, an issue which should be decided by a jury . . . ." (*Terry v. Atlantic Richfield Co.* (1977) 72 Cal.App.3d 962, 966 (*Terry*).) If sufficient evidence supports the jury's verdict, we must uphold the denial of the JNOV motion. (*Begnal*, at p. 72.)

II.

Compliance with Section 657

The court's order identifies two grounds for granting new trial: insufficiency of evidence and excessive damages. (§ 657, subds. (5) & (6).) Boy challenges the order's compliance with section 657. In assessing his contention, we ask whether the specification of reasons "promotes the legislative purpose of facilitating meaningful appellate review" by addressing proof (*Scala, supra,* 3 Cal.3d at pp. 367, 369-370) and by adequately

referring to the evidence in the record (*Romero, supra*, 24 Cal.App.4th at p. 122).

Boy contends the order fails to address proof and maintains that this order, like the one found in *Estes v. Eaton Corporation* (2020) 51 Cal.App.5th 636 (*Estes*), is too vague. In *Estes*, the trial court reasoned that " 'the evidence submitted by Eaton was not sufficient to rebut [the] evidence submitted by plaintiff.' " (*Id.* at p. 641.) However, it did not discuss the evidence that convinced it that the jury was wrong, and it did not make detailed factual findings, so it was not apparent why the court found the evidence inadequate. The appellate court explained that the order "must say *something* about the evidence, or else, . . . make factual findings that are specific and go well beyond the ultimate facts." (*Id.* at pp. 646-647.)

Similarly, the court in *Scala* focused on ultimate facts, stating there was evidence the plaintiff failed to use ordinary care and proximately caused his own injuries, without offering any details. (*Scala, supra*, 3 Cal.3d at p. 368.) There, the parties disagreed about whether a set of tiles had been delivered the day the plaintiff tripped, fell, and suffered an injury. The trial court did not express whether it determined the evidence preponderated in favor of one party over the other; it simply concluded there was insufficient evidence. (*Id.* at p. 368.) Without such details, the reviewing court did not know where to focus its attention. (*Id.* at p. 368.)

In contrast, in *Romero*, a panel of our court concluded that the order complied with section 657 because it supplied a reason for granting the new trial on the stated ground. (*Romero, supra*, 24 Cal.App.4th at p. 123.) There, the trial court stated that " '[t]he medical evidence was overwhelming that the early onset and the severity of the effect upon the plaintiff and his early deterioration of eyesight was a direct and proximate result of the negligent

33

failure of the defendant doctor to diagnose and treat the plaintiff's condition.' [ ]" (*Ibid.*) This reason directed the appellate court's attention to the aspect of the record that supported its order, the medical evidence regarding the existence of causation. (*Id.* at p. 124.)

In general, the court's order here is more like the one in *Romero*, directing us to the evidence that tends to support its ruling, than like the ones in *Estes* or *Scala*, where the courts merely addressed ultimate facts. It details the parties' positions, acknowledging Boy's various defamation theories: internal company statements made with malice, compelled self-publication, and employee comments to nonemployees.[13] The order identifies insufficient evidence as the first ground for granting the new trial, and it provides the reasons it disagreed with the jury's conclusions regarding the existence of malice, compelled self-publication, and proof of damages. Moreover, as we explain, it identifies which aspect of the evidence convinced it to grant the new trial by focusing on the adequacy of the testimony. Thus, the order "indicates [the court] deliberated over the issues . . . ." (*Lane v. Hughes Aircraft Co.* (2000) 22 Cal.4th 405, 415 (*Lane*).)

### III.

### Internal Statements and the Common Interest Privilege

#### A. Compliance with Section 657

The order explains that one reason the defendants sought a new trial was the "complete absence of . . . malice" to establish defamation. It also

---

13     Boy argued both that rumors about the reason for his discharge were attributable to Zimmer and Zimmer Dental directly, and that the existence of these statements compelled him to self-publish defamatory statements to his current employer. The special verdict form did not ask the jury to consider whether the employee statements to third parties compelled Boy to self-publish.

identifies Boy's position that evidence offered a financial motive for terminating Boy's employment, citing to the evidence Boy's attorney outlined: the company saved money by not paying Boy's salary, bonus, or stock options after it discharged him; and Boy lobbied to stay in Carlsbad and was perceived as having a bad attitude about Biomet. However, the court commented that there was no dispute that Boy was an at-will employee and explained the evidence was unpersuasive because the issue at trial was not wrongful termination. Thus, the court suggested that the evidence supported a different cause of action than defamation. The court's reference to Boy's status as an at-will employee coupled with its view that the evidence of financial motivation was "thin" makes it apparent why the court found the evidence inadequate to support the verdict (see *Estes*, *supra*, 51 Cal.App.5th at p. 647), and it addresses proof, not just the ultimate fact of malice (see *Scala*, *supra*, 3 Cal.3d at p. 367; *Mercer*, *supra*, 68 Cal.2d at p. 115). The order also separately explains that there was not "supportive witness testimony . . . of . . . fraudulent conduct by Defendants," further expressing the court's view that the only evidence of malice by the defendants came from Boy.[14] This explanation says something about the evidence and is not so vague that it prevents us from a meaningful review. (See *Estes*, at p. 647.)

B. Substantial Evidence Supports the Court's Order

We address whether substantial evidence supports the court's decision to grant new trial because the defendants separately challenge the court's denial of the JNOV on the issue of malice in their cross-appeal. While we

---

[14] We are not concerned by the court's use of the phrase "causes of action" rather than "theories of liability." Although there was only one cause of action, defamation, it was based on three separate theories, against four separate defendants.

35

conclude the court appropriately granted a new trial on the theory that Crines's and Hwang's statements were not privileged because there is sufficient evidence in the record to support the court's decision, we cannot say there is no room for a reasonable difference of opinion. (See *Terry, supra*, 72 Cal.App.3d at p. 966.)

### 1. Malice Requirements

A publication is conditionally privileged if it was made "without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information." (Civ. Code, § 47, subd. (c); *Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1112, fn. 2 (*Hui*).)

The common interest privilege applies "to statements by management and coworkers to other coworkers explaining why an employer disciplined an employee." (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1538; see *Noel v. River Hills Wilsons, Inc.* (2003) 113 Cal.App.4th 1363, 1369 (*Noel*) ["Courts have consistently interpreted section 47, subdivision (c) to apply in the employment context"].)

Insofar as the common-interest privilege is concerned, "malice is not inferred from the communication" itself. (Civ. Code, § 48; *Noel, supra*, 113 Cal.App.4th at p. 1370.) To defeat the privilege, a plaintiff must demonstrate actual malice on the part of the defendants. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 721 (*Taus*).) "[I]f malice is shown, the privilege is not merely overcome; it never arises in the first instance." (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 723, fn. 7 (*Brown*).) " '[M]alice,' within the meaning of Civil Code section 47, subdivision (c), is ' " 'established by a showing that the

36

publication was motivated by hatred or ill will towards the plaintiff *or* by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights. . . .' " ' " (*Hui, supra,* 222 Cal.App.4th at p. 1121; *Taus,* at p. 721; *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 288; see *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 931 (*Kashian*).)

To support the argument that the defendants lacked a reasonable belief in the truth of the publication, Boy challenged the quality of the investigation as well as its substantive findings.

### 2. Quality of the Investigation

Boy's attorneys questioned the quality of the investigation by attacking Hwang's methodology. Boy's attorney elicited testimony that Hwang compiled a database and reviewed thousands of emails, including all the emails about autoships and sales to Hakuho, but Hwang could not detail how he gathered the information because he did not keep a record of which searches he ran to gather the emails. Hwang also could not recall the specific questions he asked Boy during the interview, which Boy implied meant Hwang was not organized and prepared.

Boy also implied Hwang's conclusions were rushed and biased. Although Hwang testified that he used an outline created for each interview, he conducted all the interviews in a single day, and at trial he could not retell the questions he asked Boy. The interviews occurred the day before he reported his findings to the audit committee. Metzger testified that Hwang was aggressive in his interview questioning, that he leaned in, interrupted her, and spoke curtly, with a rude tone. She felt intimidated, and Hwang seemed angry when she defended Boy. Boy similarly testified that Hwang accused him of wrongdoing and read at least one email to him, indicating he

37

did not have a chance to review anything so he could answer Hwang's questions with a clear mind. He also implied that Hwang was not interested in learning the truth because Hwang did not communicate with him after the interview, even though Boy reached out with additional information about Hakuho's February orders.

Boy makes several arguments in his brief challenging the quality of Hwang's investigation, but we question some of them. For example, Boy argues that Hwang "fail[ed] to document exculpatory emails and information in his investigative report." However, Boy does not identify what exculpatory information was missing from Hwang's investigation summary that would show it was unreasonable for Hwang to draw the conclusions he did or to otherwise show that Hwang's statements were the result of ill will. Notably, the description of Boy's interview within the summary provides each of the explanations Boy gave for directing early autoships. The summary also states that Hakuho asked for the shorter shelf-life product to be resent after returning it, and that Boy told Hwang that Hakuho was a unique customer in a unique market, which only he understood and with which only he could negotiate. Moreover, although Boy contends that Hwang "fail[ed] to document the statement of any witness," evidence in the record contradicts this claim. Hwang did not record the witness interviews in real time or summarize their specific responses, but he took notes during the interviews and summarized findings from them.

Further, the defendants introduced contradictory evidence, including testimony that Hwang was not rude or dismissive, that Hwang did not seek any particular response, and that Hwang reviewed volumes of relevant information under a timeline dictated by the 10-K filing deadline.

Boy's challenges to the quality of the investigation and to Hwang's approach offered some evidence to support his theory that Hwang did not use reasonable care in determining the truth of his statements. However, we note that " '[l]ack of reasonable or probable cause . . . is not . . . a simple negligence concept. . . . [M]alice focuses upon the defendant's state of mind, not his [or her] conduct. Mere negligence in inquiry cannot constitute lack of reasonable or probable cause.' [Citations.]" (*Noel, supra*, 113 Cal.App.4th at pp. 1370-1371.) "It is only when the negligence amounts to a reckless or wanton disregard for the truth, so as to reasonably imply a willful disregard for or avoidance of accuracy, that malice is shown." (*Roemer v. Retail Credit Co.* (1970) 3 Cal.App.3d 368, 372.) As Hwang explained, he was not accusing Boy of any legal, criminal fraud; he believed Boy acted fraudulently because he engaged in "[s]ome type of dishonest, deceitful act for personal gain."

Because we recognize that there is substantial evidence to support Boy's claim that the investigation was not managed reasonably, and the jury could have found that Hwang lacked credibility, we affirm the denial of JNOV on this issue. Yet, because there was also evidence that would have allowed a reasonable juror to agree with Hwang's assessment, undercutting any finding of malice (see *Lane, supra*, 22 Cal.4th at p. 414), the court did not abuse its discretion by ordering a new trial.

### 3. Investigatory Findings

Boy attacked the substantive bases of Hwang's and Crines's conclusion by defending his actions. He suggested Crines and Hwang did not reasonably believe in the truth of their statements given his explanation. The crux of this evidence was that Boy's job was to meet his sales targets. At the end of 2014, Flynn emailed Boy informing him they needed an additional million dollars in sales for the 70 percent sales bonus payout, and Boy responded to

39

Flynn that he understood. Boy testified that he believed on December 30 that they had crossed their revenue target, so he was not worried about meeting the sales target. This evidence suggested that Boy was not motivated by self-interest when he released the autoships early, on December 31. He testified that the bonus was not his motivator; he wanted to get to 100 or 110 percent; he "didn't stop . . . worrying about sales, that's what [he did]."

Boy also introduced evidence to suggest his motives for releasing the autoships early was not about sales numbers. When Lopez-Greer reported that some sales representatives were upset because they wanted the January autoships to count in their January 2015 sales, Boy told her to tell the representatives that they were expecting large domestic and distributor orders in the first two weeks of January, and he wanted to protect their most valuable accounts with the early shipments. He believed new sales targets would be established for the sales representatives, and they were. The company adjusted the sales quotas downward.

Boy testified that he communicated routinely about the sales numbers, and his efforts to achieve the targets, with Chauhan, whose job it was to ensure the information was correctly recorded. And he was transparent about the shipments, exchanges, and returns he negotiated with Hakuho; he reported it all to Flynn. He also argued it was inconsistent and therefore unreasonable for Crines to conclude Boy had engaged in fraudulent sales

40

activity for purposes of terminating his employment while also concluding he had complied with accounting principles for purposes of government filing.[15]

Other evidence challenged Boy's perspective. In November, Boy began offering discounts to Hakuho. Hakuho accepted Boy's offer of a 15 percent discount in exchange for $2 million more in 2014 purchases, coupled with a corresponding $2 million reduction in the minimum sales in 2015. This deal suggested that Boy was trading 2015 revenue for 2014 revenue, bolstering the 2014 sales at the expense of the 2015 sales. Crines expressed concern about Boy's tactic, explaining that it sacrificed future business revenue; once prices had been reduced, it would be difficult to later raise them.

Other emails suggest Boy's motives were related to the bonus incentive. On December 23, Boy wrote to Hayse, "[F]inal stretch . . . 'anything goes' we need the sales." On December 26, after explaining concerns that the team would not achieve the 70 percent bonus payout if they did not achieve their sales target, Boy wrote, "Whatever you can pull into December . . . pull it in." Although Boy testified that he knew they had met their target on December 30, he could not remember if the calculation included the exchange rate, which would determine their actual international revenue; that would not be determined until 2015. Moreover, the same day he said he learned they met the target, he wrote to an associate director in Latin America, "[W]e still need every single $ we can get. [¶] Still fighting hard **including tomorrow for our bonus** . . . it is very close . . . need strong US sales today and tomorrow

---

15    We note *post* that these determinations are not necessarily inconsistent because a company may use more stringent standards or have higher expectations than the law mandates. However, we recognize that this is some evidence that, if interpreted as Boy prefers, could support a claim for malice.

to have a chance. . . ." (Bold added.) Also on December 30, he told Hakuho he was "still trying to generate some final year-end sales" when he offered a one-day special, which Hakuho declined.

On December 31, Boy asked Chauhan for a projection about whether they would meet their goal, indicating it was still in doubt. And he testified that he believed that they needed every dollar to get that part of the bonus. This evidence supports the defendants' testimony that they believed that Boy's motivation went beyond simply doing the job of making sales. It indicates that, in late December, the focus was on meeting the sales target for the purpose of earning the bonus money. A jury could have reviewed this evidence and concluded Boy had been too aggressive pursuing sales targets, as Crines stated in his termination phone call with Boy.

Zimmer and PWC's concerns about the transactions with Hakuho separately support the reasonableness of Crines's and Hwang's conclusions, undercutting the view that their publication showed a reckless disregard for the truth. Crines testified the "small favor" offer was problematic and fraudulent because the intent was to pull revenue into 2014 that would otherwise be earned in 2015, knowing items could be returned and refunded in 2015. Myers told Hwang it was not his understanding of revenue recognition that the company could ship product and capture the revenue with an expectation that it would later be returned. And even Flynn, who perceived the offer as a right of exchange, told Hwang he could understand the potential negative optics; the offer could have been worded more clearly.

While there was evidence supporting Crines's and Hwang's claims, Boy countered the conclusion Hwang and Crines reached in their statement, suggesting they could not reasonably have concluded he engaged in fraud or dishonesty because all his actions were simply in pursuit of the job he was

hired to do. The trial court considered Boy's evidence on this point weak and extremely thin, but it ordered a new trial, recognizing there was some evidence to support his claim. The dispute demonstrates that the court appropriately denied JNOV. Further, because substantial evidence shows Crines and Hwang could reasonably have believed the truth of their statements, the court properly granted a new trial.

### 4. Ill Will

Because Boy needs only to show either that the defendants lacked reasonable grounds for believing the truth of their statement or that they made the statements motivated by hatred or ill will (see *Taus*, *supra*, 40 Cal.4th at p. 721), a lack of evidence to support the claim of ill will makes no difference to the outcome of the appeal. However, we briefly address Boy's contention that Crines and Hwang showed actual malice.

Boy contends Crines's actions demonstrated malice because Crines rushed the investigation to complete it before the 10-K filing deadline; Crines represented to the audit committee that autoships were proper while claiming to Boy they were fraudulent; and Crines had a personal financial stake in the success of the merger. It is unclear how Crines's direction to complete the investigation in advance of the 10-K filing was malicious. Trial testimony disclosed that the company had to close any open investigation with respect to potential sales irregularities before filing the 10-K, and the existence of the anonymous complaint necessitated the investigation. Crines testified that he wanted to understand the scope of the irregularities to understand whether the external auditors, PWC, would be able to complete their audit on time. And PWC recommended that Zimmer send correspondence to international distributors as part of its audit. Thus, these

actions are all explained as conduct in the course of and on the timeline of regular business.

Moreover, Zimmer's decision to include the sales numbers in the certified financial statements, to reflect the actual booked sales in 2014 in accordance with accounting policies, is not inconsistent with the company's finding that Boy's aggressive sales practices violated the company's policies or ethical expectations because it resulted in counting in 2014 autoship sales earmarked for 2015.[16] Boy does not explain why the conclusion that his sales tactics were dishonest and resulted in falsifying the sales records, whatever the motive for the sales, evidenced ill will.

With respect to Hwang, Boy argues that Hwang made accusatory and angry statements to him during the interview and that he decided to "take away [Boy]'s stocks and options after Zimmer initially informed [him] his stocks would vest." Boy implies that Hwang's tone during the interview demonstrated "hatred or ill will, evidencing a willingness to vex, annoy or injure another person" ' " (*Kashian*, *supra*, 98 Cal.App.4th at p. 915.) However, Boy had, in fact, changed the terms for distributors at year's end, the action Hwang accused Boy of during the interview. Boy admitted as much when he defended his actions.

Boy testified that after speaking with someone at Zimmer, he understood he would be vesting his stocks, but then Hwang clarified that Boy would not receive vesting of any stocks or options. Had the 2009 stock

_____

16    Boy emphasizes that compliance means complying with state and federal law. However, the record shows that "compliance" within Zimmer was more expansive; it included complying with Zimmer's policies and procedures and behaving ethically. The termination letter stated that Boy had "violated Zimmer's Code of Business Conduct and the behavior or employees policy," not that he had violated any law.

44

incentive plan been in place, Boy would have been entitled to the vested stock options, but the 2012 stock incentive plan was in place when Boy was terminated. Boy suggests that Hwang took away stock options to which he was entitled, evincing ill will, but Boy's termination letter stated that vested stock options would lapse if not timely exercised. Moreover, once confronted with the documents at trial, Boy admitted that the stock plan changed in 2012, suggesting Hwang did not override a company decision based on a desire to cause Boy harm.

Boy points out that Zimmer could have terminated his employment without accusing him of fraud, dishonesty, and falsification of records because it was an at-will employment relationship, but instead, Crines made the accusation out of concern over the Zimmer-Biomet merger, in which he had a personal financial stake. He argues that Crines fired him to send a message to Zimmer Dental employees to comply with the merger without protestation or argument, because Crines knew the Carlsbad office was going to close and Josza would be taking on the role of president.

This theory seems unsupported by and inconsistent with the evidence. First, Boy did not present evidence that Crines was concerned the merger would not occur, regardless of the outcome of the investigation. Second, this theory hinges on Boy's claim that statements during integration committee meetings and comments about the quality of Biomet during an interview would impact the success of the merger deal, but he offered no evidence that anyone in Zimmer or Biomet felt concerned about his statements. Guthrie testified that Josza said he had a conversation with Boy about transitioning to a CCO-type position at the merged company. Further, as Boy himself points out, if Zimmer were concerned about the impact Boy would have on the merger's success, it could terminate him for any reason at any time. It

45

did not need to discharge him for cause. Finally, and most significantly, Boy provided no evidence at trial and points to no evidence in his appellate briefs that there was some need to make an example of him to send a message to the Zimmer Dental Carlsbad employees because there was no evidence that they were protesting the merger or otherwise interfering with it, or that there was some reason to send a message to "get in line."

It is also not clear why Crines's personal financial benefit from the merger shows that Crines's conclusion about Boy's conduct was made to vex Boy.[17] Crines testified that he found the Hakuho transactions problematic and fraudulent because it meant sacrificing the business going forward, suggesting the defamatory statements were not made with the intent to injure Boy but instead with the intent to protect the company. Even though Boy's testimony supports his arguments, there is ample evidence challenging his belief that the defendants acted with malice. Thus, a new trial order did not abuse discretion.

IV.

Compelled Self-Publication

A. Compliance with Section 657

The court recited Boy's argument for compelled publication: " '[I]t was reasonably foreseeable to both of these defendants that if they said to Mr. Boy, "You were fired for fraud and because you were fired for fraud, you're losing half a million dollars in bonus money and stock options," that it [was]

---

[17] Boy's attorney argued at trial that Crines was in the position of either restating the financials, causing a delay in filing the 10-K or a decline in the stock value, or Crines could blame Boy for any financial issues by firing him. Crines opted to do the latter so that he could make sure the merger occurred. Defense counsel argued there was no evidence connecting a delayed 10-K filing to delaying the merger.

reasonably foreseeable that he would have to file a lawsuit on that issue and that, if he got other employment and intended to file a lawsuit, he would have to disclose.' " The court's recitation of Boy's argument directs us to the evidence it questioned. Specifically, it challenged whether Zimmer and Zimmer Dental anticipated being sued, explaining there was no "supportive witness testimony on the issue of self-publication of defamation." This explanation coupled with the court's other statements that this was not a wrongful termination case, and that Boy had an at-will employment agreement further informs us that the court was not persuaded that Zimmer and Zimmer Dental could anticipate being sued for explaining their reasons for discharging Boy, as they could terminate his employment at any time. The court did not merely conclude that Boy failed to prove compelled self-publication, the ultimate fact, as was the case in *Scala*. It directed us to the (non)existence of nonspeculative evidence regarding whether the Zimmer entities expected Boy to sue them. Thus, it meets the requirements of section 657.

### B. Analysis

There is a substantial basis in the record for the court to order a new trial on this liability theory and some testimony that warrants the denial of JNOV on this theory. Boy began a job at Zeiss five months after his discharge from Zimmer Dental. When Zeiss representatives interviewing Boy mentioned the Zimmer-Biomet merger and asked the circumstances of Boy leaving Zimmer, Boy joked that he was not going to move to Florida. Thus, he did not feel compelled to share the reason for his departure from Zimmer during his interview.

Further, although he avoided hosting social gatherings, concerned that the fraud accusation would come up, this does not explain why he was

47

compelled to tell Zeiss that he was discharged for "engag[ing] in fraudulent sales activity, dishonesty, and falsification of company records," the finding the jury made on the special verdict form.[18] Boy argued in his opposition to the motion for JNOV that he felt compelled to disclose that he was terminated "for compliance reasons." He believed people knew the reason for his discharge because he was publicly escorted from the Zimmer premises and because he heard people were talking about the reason for his discharge. Boy implies that because he believed employees were discussing his departure as for "compliance reasons," he felt compelled to disclose more details, that Crines and Hwang told him he was being discharged for "engag[ing] in fraudulent sales activity, dishonesty, and falsification of company records to other person(s)." Even ignoring that he testified that his motive for disclosing the reason for his termination was the lawsuit he filed and not the rumors about the reason for his discharge, the special verdicts base the compelled self-publication finding on Crines's and Hwang's

---

[18] In his discovery responses, Boy indicated he told his employer he was suing Zimmer and Zimmer Dental because "there were business transactions that were misinterpreted." Boy made the same statement in a declaration. He also signed interrogatories that omitted Zeiss executives from the list of people he told the reasons for his termination. He testified at trial that he did not recall more specifics when he was deposed in 2017, but he remembered at trial that he told Zeiss he was fired for fraud and falsification of sales records. The defendants argue his contradictory trial testimony constitutes surprise that prejudiced them and warrants a new trial on the issue of compelled self-publication. Because we are affirming the order granting a new trial on other grounds, we do not reach this issue separately.

statements.[19]  The court found that Crines's and Hwang's statements could have been privileged, so it was appropriate to grant the request for new trial to reconsider the theory of compelled self-publication, as it was based at least in part on those statements.

There are also questions about whether Zimmer or Zimmer Dental should have foreseen that Boy would sue them.  Zimmer's policy was not to reveal the reason for an employee's departure.  And because Boy's employment was at-will, and statements made to the employee in the course of the termination are subject to a conditional privilege, it is not clear why Zimmer did foresee or should have foreseen being sued.  In other words, as the order states, there was no supportive witness testimony to support Boy's claim that the disclosure was actually compelled.

We recognize that Boy testified that he disclosed the circumstances of his discharge from Zimmer to a job recruiter and never heard from the recruiter again.  There is no information in the record that suggests the recruiter pressured him to disclose the reason for his discharge.  Thus, his decision to disclose those details in this case is not evidence of compulsion.

---

[19]   Boy argues that expert testimony that an employee who did not honestly explain why he left his former employment would raise a red flag supports his claim for compulsion to re-publish a defamatory statement, comparing his situation to the one in *Tilkey v. Allstate Insurance Company* (2020) 56 Cal.App.5th 521.  The vocational expert in *Tilkey* testified that the accusation that Tilkey engaged in threatening behavior was "an absolute killer" for future employment unless Tilkey re-published and refuted it because his employer made the accusation in a Form U5 filing available to future employers in his area of business.  (*Id.* at pp. 549-550.)  These situations are not the same.  Boy repeated the statement even though there was no evidence Zimmer or Zimmer Dental shared the reason for his termination in a location where a prospective employer could access it, and even after he had already become employed elsewhere.

Moreover, Brewer, the corporate recruiter who testified that he would not present an applicant who had been discharged with allegations of fraud or falsification of records, even if he discovered that information through a back-channel search, likewise does not support Boy's claim of compulsion. Brewer's comments suggest it would be better never to self-publish and disclose such an allegation to defend against it because regardless of doing so, there would never be a favorable outcome for the applicant. If anything, this suggests an employee should not feel compelled to share such information.

We sustain a new trial order on appeal " 'unless the opposing party demonstrates that no reasonable finder of fact could have found for the movant on [the trial court's] theory.' " (*Lane, supra*, 22 Cal.4th at p. 412.) Here, Boy has not demonstrated that no reasonable fact finder could have agreed with the court on this point. Thus, the court did not abuse its discretion by granting a new trial on this theory of liability.

V.

Statements by Zimmer Employees to Third Parties

A. Compliance with Section 657

Boy next contends the court did not reference in its order the third theory of liability, against Zimmer and Zimmer Dental, based on respondeat superior, and the order therefore must be reversed, regardless of our conclusions regarding the other reasons for granting a new trial. Boy's theory was that Zimmer employees, acting in the scope of their employment, told people outside Zimmer that Boy was terminated for compliance reasons. Boy argues the jury's special verdict finding that Zimmer and Zimmer Dental

50

were responsible for defamatory statements was based on Curtis's and Josza's statements to Guthrie and Oto, which Guthrie repeated to Boy.

The court did not address this theory of liability in the order among its reasons for new trial.[20] Thus, we cannot affirm the court's order granting a new trial on the ground of insufficiency for this reason.[21] (*Mercer, supra*, 68 Cal.2d at pp. 114-115, 120 [appellate review is limited to reasons specified in the order].) However, as we explain *post*, our independent review of the record in response to the cross-appeal uncovers no substantial evidence to support a liability finding on this basis. Thus, the court erred by failing to grant JNOV on this theory.

---

[20] The court cited arguments and referenced evidence regarding the rumors, but it did not separately address it as one of the reasons for granting a new trial.

[21] We question the applicability of *Previte v. Lincolnwood, Inc.* (1975) 48 Cal.App.3d 976, 979-980, 986-987 to the facts of this case. There, the appellate court reversed an order granting a new trial when there were multiple theories of liability, but the order only complied with section 657 with respect to one of the theories. It explained the theory the order addressed was "only one of several issues of fraud upon which there was evidence which would support the implied finding of the jury that fraud existed and which therefore would support the verdict." (*Id.* at p. 987.) It concluded that "[t]o grant a new trial in such a situation, the trial court must adequately specify reasons why the evidence is insufficient on all issues presumably found by the jury to support the verdict." (*Ibid.*) In essence, the court concluded that insufficient evidence of one theory left the verdict fully supported and could not justify a new trial. Here, however, we do not need to presume what the jury found because the special verdicts provide that information. Further, the new trial order's compliance with section 657 on two of the theories of liability disposes of all theories of liability regarding two of the defendants, and the liability conclusions for those defendants impacts the damages award.

Although we conclude the court should have granted JNOV on this theory, we note that had there been evidence to support this theory, the court's decision to grant a new trial would not have been erroneous in these circumstances. There were separate verdicts against Zimmer and Zimmer Dental. The first question in each special verdict against Zimmer and Zimmer Dental asked whether Boy was compelled to disclose that the company communicated that he "engaged in fraudulent sales activity, dishonesty, and falsification of company records to other person(s)." The jury answered, "Yes." It also found that Boy felt compelled to self-publish that statement. The jury's finding that Zimmer and Zimmer Dental made statements that Boy "engaged in fraudulent sales activity, dishonesty, and falsification of company records to another person," was based on Crines's and Hwang's statements. Thus, when the jury found that Boy was compelled to disclose those specific statements, that finding was likewise based on Crines's and Hwang's words being unprivileged and therefore defamatory. However, the trial court disagreed with those findings when it granted a new trial, concluding there was insufficient evidence that Crines or Hwang acted unreasonably or with malice, and also commenting that there was no supportive witness testimony showing Boy was compelled to self-publish Crines's and Hwang's statements.

The special verdicts do not base the compelled self-publication on any other statements. They do not conclude, as Boy argued when opposing the motion for JNOV, that Boy felt compelled to disclose to persons outside the Zimmer organization that he was terminated "for compliance reasons." Jurors found that Boy was under strong pressure to communicate the "statements that he engaged in fraudulent sales activity, dishonesty, and falsification of company records to other person(s)," i.e., the statements

52

Crines and Hwang made.  Thus, even absent our conclusion that JNOV should have been granted on the third theory of liability, the court did not abuse its discretion by granting a new trial.

Additionally, as we detailed *ante*, whether these statements can be appropriately characterized as defamatory depends on whether they were made with malice.  Boy's repetition of them is not a valid theory for defamation if they were privileged.  Thus, against Zimmer Inc. and Zimmer Dental, the court's order for new trial disposes of the first two theories of defamation.

Moreover, unlike the details of the theories of liability available on the special verdict form, the damages questionnaire here did not ask the jury to allocate or apportion the damages among the defendants or based on the theories of liability.  The damages questionnaire awarded past and future economic damages "as a result of the defamatory statements."  It is not clear if the jury made these awards due to Crines's and Hwang's statements, Boy's restatements to Zeiss, the compliance rumors, or some combination of them.

It is within the trial court's discretion to grant a new trial on all issues or to grant one on a limited basis, and reviewing courts "should not modify an order granting a new trial on all issues to one granting a limited new trial 'unless . . . an order [for limited retrial] should have been made [by the trial court] as a matter of law.' " (*Shelbauer v. Butler Manufacturing* (1984) 35 Cal.3d 442, 456.)  Furthermore, when a limited retrial could prejudice either party, the failure to grant a new trial on all the issues is an abuse of discretion.  (*Simers v. Los Angeles Times Communications LLC* (2018) 18 Cal.App.5th 1248, 1282-1283 (*Simers*), citing *Liodas v. Sahadi* (1977) 19 Cal.3d 278, 285.)

*Simers* was an employment disability and age discrimination case in which the plaintiff alleged he had been constructively discharged. The parties agreed to a special verdict form that "allowed the jury to award past and future noneconomic damages without identifying which noneconomic damages were caused by the constructive termination and which were caused by the discrimination." (*Simers, supra,* 18 Cal.App.5th at p. 1251.) The trial court granted JNOV on the constructive termination claim, but otherwise denied JNOV because it found substantial evidence supported the discrimination causes of action. However, it granted a new trial on damages because it was not possible to determine what amount of noneconomic damages the jury awarded based on the discrimination and not on the constructive discharge. (*Ibid.*) Finding no error in this reasoning, the appellate court affirmed the grant of new trial. (*Id.* at p. 1279.) Similarly here, it is impossible to determine what amount of damages the jury awarded based on Crines's and Hwang's actions; thus, it was appropriate to grant a new trial.[22]

---

[22] We do not consider Boy's contention, made on appeal for the first time in his reply brief, that the defendants are estopped from challenging any perceived error in the damages questionnaire because the defendants introduced it and stipulated to it. Not only does failing to raise it in the opening brief waive it (see *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6), but the contention presumes the defendants are challenging the damages questionnaire as legally deficient. The defendants' request for new trial did not make this argument, and the defendants expressly denied any claim that the special verdict forms were improper in their reply brief before the trial court.

## VI.

### Damages

Because we have concluded the new trial order complies with section 657 on the liability issues, and the liability determinations impact the damages, we need not reach a conclusion regarding whether the new trial order separately complies with section 657 with respect to the damages issues. Were we to do so, however, we would conclude this portion of the order complies with section 657.

The court explained that it did "not hear concrete evidence to support past, present or future economic or non-economic damages" and specified that "the evidence displayed that plaintiff landed a better compensation position with a similar company to defendant." It also stated that it was "improper for a jury to allow speculative or unfounded damages in the absence of supporting evidence to justify the verdict." Comparing the order to the one in *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 62 (*Stevens*), Boy contends the court's statement was one of ultimate fact, restating the ground instead of "hint[ing] at any portion of the record that would tend to support the judge's ruling." (*Ibid.*) In *Stevens*, the court noted that the new trial order "ma[de] no pretense of specifying reasons upon which the judge based his decision," offering only the statement that the verdict was excessive and not sustained by the evidence. (*Ibid.*)

The new trial order in *Stevens* was based solely on the ground of excessive damages, not insufficient evidence, and it did not specify reasons for reaching that conclusion. (*Stevens, supra*, 9 Cal.3d at p. 63.) The new trial order here identifies the deficiency because it explains that the evidence demonstrated that Boy "landed a better compensation position with a similar company to defendant." The court also stated that it did not "hear concrete

55

evidence to support past, present or future . . . non-economic damages." It expressed concerns elsewhere in the order about the connection between the damages and the defamatory statements, noting twice that this was a defamation action, not one for wrongful termination, indicating the damages should not flow from the termination but instead from the defamatory statements.

These details show that the court deliberated before reaching its conclusion, and it addresses the proof, not just ultimate facts. (See *Scala, supra*, 3 Cal.3d at p. 367; *Mercer, supra*, 68 Cal.2d at p. 115.) This adequately refers to the record. (See *Romero, supra*, 24 Cal.App.4th at p. 122.) Thus, on the issue of economic damages, the order complies with section 657.[23]

The court separately offered an alternative ground for the new trial, finding the damages award excessive. (Civ. Proc. Code, § 657, subd. (5) [excessive damages].) It explained there was an absence of evidence to support the size of the damages award, and it expressed concern that the parties' passions and credibility determinations "supplanted any evidentiary justification for such a large verdict." The order says the motion for new trial is based "primarily on the issue of excessive damages not properly supported by the record of introduced evidence," and it stated that it was improper for the jury "to allow speculative or unfounded damages . . . to justify the verdict."

_____

[23]    Boy argues in his respondent's brief to the cross-appeal that the jury could have understood that termination "for compliance reasons" met the requirements of defamation per se. However, the court ruled the matter was not one of defamation per se; it instructed the jury with CACI No. 1705, defamation per quod. Boy's appeal does not challenge the use of this instruction.

As with the insufficiency of evidence ground, when the ground for granting new trial is excessive damages, there must be a specification of the reasons beyond phrasing in terms of ultimate facts. (*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 146-147 (*Mokler*), overruled on other grounds in *Lawson v. PPG Architectural Finished, Inc.* (2022) 12 Cal.5th 703 [addressing burden-shifting in whistleblower claims].) "To say that damages are inadequate or insufficient or unreasonable without more is to state an ultimate fact." (*Sanchez v. Hasencamp* (1980) 107 Cal.App.3d 935, 941.) However, identifying the specific categories in which the damages are deemed inadequate, i.e., lost earnings, pain and suffering, goes beyond the ultimate facts. (See *ibid.*)

In *Mokler*, the matter proceeded to trial on unlawful retaliation and hostile work environment claims. (*Mokler*, *supra*, 157 Cal.App.4th at p. 132.) The plaintiff testified that she felt threatened and humiliated by the employer's actions surrounding her termination. (*Id.* at p. 147.) The court ordered a new trial after concluding the noneconomic damage award was excessive. (*Id.* at p. 133.) The trial court wrote: "(1) there were no damages due for the harassment, [¶] (2) no physical pain and suffering, requiring medical or professional attention, [¶] (3) no evidence as to loss of reputation, [¶] (4) no evidence plaintiff had trouble finding a new job, [¶] (5) no evidence the public scorned plaintiff, [¶] (6) no evidence of any future damages or injury. [¶] Therefore, the non-economic damages herein in the amount of $1.6 million were excessive." (*Id.* at p. 147.) Based on its independent appraisal of the evidence, the court set aside the verdict. (*Ibid.*) The appellate court affirmed the order. It noted that evidence the plaintiff cited on appeal failed to demonstrate that the six items listed by the trial court were unsupported or contradicted. It also explained the plaintiff "did not

require medical or professional attention," and there was no evidence her reputation was damaged, evidenced by finding a new job just a couple weeks after her discharge. (*Ibid.*)

Although the court here did not explain its thinking as articulately or clearly as the court did in *Mokler*, the order nonetheless identifies the reasons the damages award was excessive. First, the court concluded the economic damages were excessive because there was no evidence to support the past or future economic damages, given that Boy "landed a better compensation position," as we detailed *ante.* Second, the court concluded the noneconomic damages were unsupported by concrete evidence because there was no direct evidence to support its size, finding the amount to be speculative and unfounded. Like in *Mokler*, there was not testimony that Boy required medical or professional attention; nor was Boy's reputation damaged, as evidenced by finding a new job in his desired position with comparable compensation, evidence the court pointed out.

The court here did not simply highlight the jury's passion; it expressed concern that the jury's passion could not justify such a large verdict because it "found a complete absence of direct or indirect evidence . . . to support the size of the damages award in the verdict," and it explained it was improper for the jury "to allow speculative or unfounded damages . . . to justify the verdict." These statements were buttressed by the court's commentary that there was no wrongful termination cause of action, indicating evidence derived from loss of employment or the shame associated with getting fired rather than Crines's and Hwang's statements was not an appropriate basis for the $1.5 million noneconomic damages award. The court's concerns about conflating Boy's response to being discharged from employment with his reaction to the allegedly defamatory statements supports its concerns that

the jury's award was impacted by passion rather than evidentiary justification.

## VII

## Other JNOV Issues

### A. Evidence of Substantial Truth

The defendants contend that the evidence demonstrates that Boy engaged in fraudulent activity, dishonesty, and falsification of company records, and he was therefore discharged for "compliance reasons." Because truth is a complete defense to defamation (*Campanelli v. Regents of the Univ. of Cal.* (1996) 44 Cal.App.4th 572, 581), they explain, they are entitled to judgment as a matter of law.

Whether the statements made by Crines and Hwang are substantially true depends on what definition of the word "fraud" the jury applied. Boy's attorney argued vociferously that fraud is a crime that requires "misrepresentation designed to induce reliance for the purpose of depriving somebody," which he contended did not happen in this case. The defendants objected to any instruction on the meaning of the word "fraud." They argued that "fraud" had a common meaning that the jury could apply.

The court instructed the jury:[24] "In the legal context, the civil claim of fraud has the following elements: (1) misrepresentation; (2) knowledge of falsity; (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damages. It explained that "[i]n determining whether a person's reliance on a misrepresentation was reasonable, the matter must be material. A matter is material if a reasonable person would find it important

---

[24] The court ruled it would offer an instruction with various definitions of fraud. Neither party challenges the court's decision or the corresponding jury instruction.

in determining his choice or her choice of action." Finally, the instruction noted that "[d]ictionary definitions of the word 'fraud' include, for example, 'an act of deceiving or misrepresenting,' and 'deceit, trickery, sharp practice, or breach of confidence perpetrated for profit or to gain some unfair or dishonest advantage."

The special verdict forms do not reveal which definition or definitions the jury applied in determining the truth of the statements. Thus, we consider whether there was substantial evidence demonstrating either of the two transactions identified by the defendants as fraudulent were substantially true under all the definitions supplied to the jury.

### 1. Nonconforming Shelf-life Transaction

The nonconforming shelf-life transaction occurred when, without first obtaining Hakuho's approval, Boy shipped product to Hakuho that did not meet the shelf-life requirements. Boy explained there were ongoing negotiations, over a four- or five- year period, regarding the shelf-life of product. He testified that Zimmer only guaranteed to Hakuho product with a one-year shelf life, even though Hakuho was unhappy and frustrated because it preferred a longer period of time. Boy explained that Hakuho usually accepted what Zimmer Dental offered because Zimmer could not meet Hakuho's preference. Boy acknowledged that the products he sent did not meet Hakuho's preference, but he was motivated by what he perceived Hakuho would need. He was concerned Hakuho would run out of the product, so the nonconforming shipment was to benefit Hakuho.

In essence, Boy testified that he acted in Hakuho's interests by sending material the company needed. He expected Hakuho to keep the product; thus, the sale was an honest, valid sale. In February, Hakuho reordered the

goods it rejected the month before, which Boy suggested vindicated his decision to ship the nonconforming product.[25]

Although there was ample evidence at trial to contradict Boy's explanation, including challenges to his claim that the company did not guarantee shelf-life beyond one year and evidence that nonconforming shipments required prior customer authorization, in evaluating an order denying JNOV, we ask only whether substantial evidence supports the jury's verdict, and we ignore the contradictory evidence. (*Begnal*, *supra*, 78 Cal.App.4th at p. 72.) Here, Boy's explanation for his decisions supplies evidence that his conduct was not fraudulent.

## 2. Autoships

The second transaction the defendant's point to is the early release of the January 2015 autoships. Boy explained this decision in various ways. First, he was concerned that there would be an inventory issue for U.S. customers as a result of the build-up of international orders being released. Then, he believed there would be several large, new Regen orders in January placed by sales reps who did not make their fourth quarter numbers, and he wanted to protect their most important Regen customers, ensuring access to their product. Finally, he said the company was expecting large domestic and distributor orders in the first two weeks of January, and he wanted to protect their most valuable accounts. Although the defendants characterized this testimony as shifting and inconsistent to challenge Boy's credibility and sincerity, the jury could have found Boy credible and believed any of these explanations.

---

[25] Hakuho did not reorder all the goods included in the nonconforming shelf-life order.

Boy also offered evidence to explain that he lacked intent to commit fraud, and that Zimmer and Zimmer Dental suffered no damages. He testified that he believed they crossed their revenue target threshold the morning of December 30, and he was not worried about meeting their sales target, implying he had no reason to defraud the company and thereby defeated the intent requirement. He also provided evidence that Zimmer reported the sales in its 10-K, suggesting there was no damage to Zimmer as the result of his actions. This evidence supports the verdict.

Boy's attorney told the jury that Hwang's email had accused Boy of fraud, which "has a specific legal meaning," and that the language in Boy's summary report essentially "accused [Boy] of a crime." There was no evidence to show that such an allegation was true, accurately pointing out that Boy was not sued, arrested, or prosecuted for fraud. We recognize that Hwang testified he "was not accusing Mr. Boy of legal, criminal fraud. [¶] . . . [¶] The act was a dishonest act for personal gain." However, if the jury applied Boy's definition of civil fraud, some evidence supported the conclusion that Crines's and Hwang's statements were not substantially true. Thus, this issue did not warrant granting JNOV.

## B. Evidence of Fault

The defendants next contend they should have been granted JNOV because there was no evidence that Crines and Hwang negligently communicated that Boy engaged in "fraudulent sales activity, dishonesty, and falsification of company records." They maintain that given the scope of Hwang's investigation, which was more than reasonably conducted, reasonable minds could not reach different conclusions on this point. Absent evidence of negligence, Boy has not met his burden of proof, justifying JNOV.

In a case like Boy's, where the plaintiff is a private individual, the applicable standard of fault is negligence, i.e., whether the defendants failed to use reasonable care to determine the truth or falsity of the statement. (*Brown, supra,* 48 Cal.3d at pp. 741-742; *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 114; *Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 990.)

Boy challenged the reasonableness of Hwang's investigation as a way to challenge the reasonableness of Hwang's and Crines's conclusion that Boy engaged in fraudulent sales activity, dishonesty, and falsification of company records. As we detailed *ante*, there was substantial evidence to support Boy's claims that Hwang's investigation, upon which Crines based his conclusions, was rushed and biased. Thus, reliance on its findings evidences a lack of reasonable care determining the truth or falsity of the statement. While there was evidence to dispute this view, in evaluating the denial of JNOV, we accept the evidence that supports the verdict as true and disregard the conflicting evidence. (*Sweatman, supra*, 25 Cal.4th at p. 68; *Begnal, supra*, 78 Cal.App.4th at p. 72.) Having done so here, we conclude the court did not abuse its discretion.

C. Statements that Boy's Discharge was for "Compliance Reasons"

The defendants contend they are entitled to JNOV on the theory that employees, acting within the scope of their employment, "state[d] to persons outside the Zimmer organization that Plaintiff was terminated for compliance reasons." We agree.

Boy identifies three witnesses to support his position, but none of them supplied evidence to support that verdict. First, Oto, a supplier outside of the Zimmer companies, testified at deposition that Curtis, vice president of marketing for Zimmer Dental, and three other Zimmer Dental employees,

63

attended a dinner with her during a London trade show in June 2015. Curtis told Oto that Boy had increased the December revenue and pumped up the sales. She did not recall him mentioning that Boy took action to ensure a bonus. She did not remember Curtis using the word "compliance" in connection with Boy's departure. She did recall someone named Michael Racioppi using the word "compliance" when discussing Boy's departure. However, the deposition excerpts admitted at trial do not identify Racioppi, his role in Zimmer, or the details of what he conveyed to Oto. Further, although Boy testified that Oto told him that at least a dozen Zimmer Dental employees at the NYU conference had called her to discuss his termination, that offers no information about the substance of those conversations. Accordingly, information from Oto does not provide evidence that an employee of Zimmer "acting in the scope of their employment stated to persons outside of the Zimmer organization that Boy was terminated for compliance reasons."

The other testimony Boy directs is to comes from Guthrie, who testified about what he heard from Curtis and Josza. Guthrie testified regarding statements he heard from Curtis and Josza when they were employed by a Zimmer entity. Thus, any statements made to Guthrie about Boy's departure do not provide evidence of statements made "to persons outside the Zimmer organization." Guthrie mentioned that people who attended the NYU symposium commented on Boy's absence, but that does not show that Zimmer employees told nonemployees anything specific about why Boy was no longer with the company.

There is also no evidence that those involved in the decision to terminate Boy communicated their reasoning to others, who may then have shared rumors of the reason for the departure based on what they had heard.

Crines and Hwang both testified they did not personally communicate any information regarding the termination decision outside the report to the executives. Flynn was not told why Boy was discharged from employment. No one disclosed to Guthrie the specific reason for Boy's departure. When pressed, Guthrie explained that "[w]hen someone's usually walked out of the building, it's usually a legal or compliance issue." However, the court instructed jurors that Boy being escorted from the premises was not a statement and to disregard testimony that it constituted a statement. Our independent review of the record reveals that there is not substantial evidence that Zimmer employees "acting in the scope of their employment stated to persons outside of the Zimmer organization that Boy was terminated for compliance reasons." Accordingly, JNOV should have been granted on this theory.

## DISPOSITION

The order denying JNOV on the liability theory of whether Zimmer or Zimmer Dental employees, other than Crines or Hwang, acting within the scope of their employment, stated to persons outside the Zimmer organization that Plaintiff was terminated for compliance reasons is reversed. On remand, we direct the superior court to enter judgment in favor of Zimmer

and Zimmer Dental and against Boy on that issue.  The order granting new trial on all other issues is affirmed.

Parties to bear their own costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

DATO, J.

BUCHANAN, J.